UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| PAMELA WHITTLE and<br>JAMES WHITTLE,<br><br>*Plaintiffs,*<br><br>vs.<br><br>TOWN OF COVENTRY, by and through<br>Its Treasurer, Warren West; et al.,<br><br>*Defendants.* | C.A. No. 06-148 S |

**DEFENDANTS' PRETRIAL MEMORANDUM**

## I. INTRODUCTION

Plaintiff, Pamela Whittle, brings the instant Complaint alleging that Coventry police officer, Gregory Guillette, violated her constitutional rights and assaulted her by using excessive force during her March 20, 2003, arrest. Plaintiff also brings a claim against the Town and unnamed supervisors for the alleged failure to train and supervise allegedly in violation of her constitutional rights. Plaintiff's husband, James Whittle, now-deceased, likewise filed a loss of consortium claim derivative of plaintiff's claims against defendants.

Defendants deny that Officer Guillette used excessive force in apprehending plaintiff. Rather, by virtue of her nolo plea to the charge of assault, plaintiff has admitted that she struggled with and assaulted the officer when the officer tried to take her into custody. Defendants thus submit that Officer Guillette used a reasonable amount of force in taking plaintiff into custody.

## II. FACTS EXPECTED TO BE PROVEN IN DEFENSE:

On March 20, 2003, plaintiff picked up her teenage daughter at the Judi T. Dance Studio in West Warwick. After she left the class, an instructor at the school contacted the West Warwick police department and advised them that she believed plaintiff was intoxicated and driving with her minor child in the car towards their home in Coventry. The instructor gave the West Warwick police plaintiff's license plate. When West Warwick police were unable to find plaintiff in the area, they contacted Coventry police and advised them to be on the lookout for the vehicle (BOLO).

After receiving the BOLO, Officer Guillette was sitting at an intersection on his normal patrol at Flat River and Walker Lane in Coventry when he saw plaintiff's vehicle pass by. Officer Guillette followed accordingly and conducted a MVD check on the vehicle. Officer Guillette discovered that the owner of the car, plaintiff, Pamela Whittle, had an expired license. Officer Guillette stopped the vehicle on Flat River Rd. After receiving the license and registration from the plaintiff, Officer Guillette saw that the plaintiff's eyes were very bloodshot and watery. Officer Guillette asked plaintiff if she had been drinking to which she responded she had. Officer Guillette asked her to step out of the car to participate in a field sobriety test. She consented and passed this test. Guillette then told plaintiff to stay in her car while he wrote her a citation for driving with an expired license.

While Officer Guillette was sitting in his cruiser looking down to write the citation, plaintiff drove away. When Officer Guillette looked up and saw her gone, he pursued in the direction of her residence. When he caught up with plaintiff on Hill Farm Rd, Officer Guillette turned on his lights and his siren. Rather than stop, plaintiff kept going, ignoring the pursuing officer and turning onto Hill Farm Camp Road. The road was a dirt, poorly kept road. Plaintiff

turned right at the fork in the road and, as she passed the ball field, went off the road and into the brush becoming stuck in a mud. Officer Guillette pulled his cruiser in front of her vehicle to block her in, got out of his cruiser and ran to the front of plaintiff's vehicle ordering her to get out of car. Plaintiff ignored the officer and continued to attempt to get her vehicle out of the mud. Plaintiff's car suddenly sped towards the officer causing Officer Guillette to dive out of the way in order to avoid getting hit. Once loose, plaintiff pulled back onto the road and continued down Hill Farm Camp Road.

When plaintiff reached her residence, she pulled into the driveway. Officer Guillette immediately blocked her vehicle in with the cruiser and approached her car. As he got to plaintiff he opened the car door and ordered her out of the car. Plaintiff refused. Officer Guillette then reached in to remove her from the vehicle. Plaintiff advised the State Police that as soon as Officer Guillette started to take her out of the car she began struggling with him by kicking him. According to plaintiff, she specifically attempted to kick Officer Guillette in the groin area. Plaintiff was in fact successful in kicking Officer Guillette in the genitals and twice in the ribs. Officer Guillette then used two (2) short bursts of capstun on Plaintiff after which he was able to get her out of the car and, using an arm bar, brought her to the ground. While on the ground, plaintiff tucked her arms underneath her and continued to struggle, resisting the arrest and refusing to be handcuffed. Officer Guillette then kneed her in the rib area to gain control of her right hand while using his body to hold her on the ground. After placing the cuff on her right hand, Officer Guillette was able to pull her other arm out from under her and handcuff her. Officer Guillette then put her in the back of his patrol car.

During the time that Officer Guillette was trying to get plaintiff out of the car, plaintiff's daughter ran out of the car, up to the house, calling for her father James Whittle. Mr. Whittle

appeared while Officer Guillette was struggling with plaintiff. Officer Guillette instructed Mr. Whittle to stay back until he had his wife in custody. Mr. Whittle complied with Officer Guillette's request.

After placing plaintiff in the cruiser, Officer Guillette went to the porch to explain to Mr. Whittle and his daughter what had happened. Lt. John Sullivan, followed by Officer Ricci, arrived about that same time and instructed Officer Guillette to transport plaintiff to the police department. Lt. Sullivan surveyed the area and then likewise responded back to the police department taking the same route followed by Officer Guillette. When they arrived at the police station, plaintiff was given the opportunity to flush her eyes out with water. After doing this she began to complain of chest pains. Rescue was accordingly called and plaintiff was transported to Kent County Hospital where she was treated by an emergency room doctor. While at the hospital, plaintiff did not complain of hip pain. In fact, she did not report pain in her hip area until three (3) weeks later. At the hospital, plaintiff complained of chest pain and scratches on her right arm. Officer Guillette also sought treatment at the hospital for bruises to his rib area caused by plaintiff kicking him. After being examined by the doctor and cleared, plaintiff was returned to the police station and charged with felony assault with dangerous weapon, assault of a police officer, reckless driving, eluding police and driving on an expired license. The felony assault with dangerous weapon was returned with no information signed. In a plea bargain, plaintiff subsequently pled nolo contendere to a reduced charge of assault, eluding police and reckless driving while the driving on an expired license was dismissed pursuant to Rule 48(a) of the R.I. Rules of Criminal Procedure. Plaintiff was sentenced to one (1) year probation with seventy-five (75) hours of community service on all charges.

Over two and a half years after plaintiff's arrest, in October 2005, plaintiff, by and through her attorney, lodged a complaint with the State Police alleging that Officer Guillette raped her on the way from her house to the police station on the night of her arrest. Plaintiff specifically alleged that Officer Guillette pulled over about five (5) minutes after leaving her residence and, leaving the cruiser idling, opened the back door of the cruiser, pushed her on her back and raped her for a period of one to five minutes. The first time plaintiff told anyone about this alleged rape was in the summer of 2005. The State Police conducted a thorough investigation of the allegations, including subjecting plaintiff to a polygraph examination, and ultimately concluded that in addition to the fact that it was factually improbable that the events as described by plaintiff took place, plaintiff had been "less than honest" in her allegations by offering inconsistent statements. Officer Guillette was thus cleared of all charges. Plaintiff chose not to bring a civil action seeking damages for this alleged rape.

## III. SUPPORTING LAW

### A. Counts II & IV[1] — Fourth Amendment Claims against Guillette

In Counts II and IV plaintiff makes the general allegation that the actions of Officer Guillette amounted to a violation of her right to "due process, equal protection and civil rights" as "afforded the plaintiff by virtue of the Fourth, Eleventh and Fourteenth amendments to the U.S. Constitution." *Plaintiffs' Complaint,* ¶ *9*. Plaintiffs' Complaint is premised on the allegation that Officer Guillette violated plaintiff's constitutional rights by using excessive force

[1] As a preliminary, procedural matter, it is apparent that Counts II, standing on its own, does not state a legally cognizable cause of action. More specifically Count II appears to seek to maintain a direct cause of action for the violation of certain constitutional rights (i.e. due process and equal protection). However, there can be no dispute that "a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution." *Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir., 2001).* Rather, in order to recover for alleged violations of an individual's constitutional rights, a plaintiff must bring a claim pursuant to *§ 1983*. *Monroe v. Pape, 365 U.S. 167, 182 (1961) (§ 1983 is remedial and intended "to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position").* Nevertheless, plaintiff has brought a *§ 1983* claim in Count IV for the same alleged constitutional violations.

and assaulting her when he attempted to take her into custody on March 20, 2003. Of course, a claim of excessive force falls under the protections of the Fourth Amendment of the U.S. Constitution. In particular, the Fourth Amendment grants citizens the right to be free from unreasonable search and seizure. The Courts have found that the use of an unreasonable amount of force to effectuate a lawful seizure amounts to a violation of the Fourth Amendment. *Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 51 (1st Cir. 2005).* Accordingly, defendants will first present law with regard to plaintiff's Fourth Amendment claim.

The Courts have broken down an excessive force claim into a three-part test. The plaintiff must show: (1) a significant injury; (2) resulting directly and only from the use of force that was clearly excessive to the need, and (3) the excessiveness of the force was objectively unreasonable. *Reese v. Anderson, 926 F.2d 494, 500 (5th Cir. 1991).* Because it is a Fourth Amendment claim, excessive force claims are thus evaluated under the Fourth Amendment's objective reasonableness standard that permits force to be used to the extent an officer reasonably, even if mistakenly, believe is necessary. *Whitfield v. Melendez-Rivera, 431 F.3d 1, 7 (1st Cir. 2005).*

"Though the reasonableness test under the Fourth Amendment ''is not capable of precise definition or mechanical application,'' . . . [the Supreme Court] prescribes three criteria for evaluating the objective reasonableness of the force used: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Alexis v. McDonald's Restaurants, 67 F.3d 341, 352-353 (1st Cir. 1995) quoting Graham v. Connor, 490 U.S. 386, 396 (1989).* It is further recognized that some amount of physical coercion is typical during an arrest so that "[n]ot every push or shove, is actionable." *Johnson v.*

Glick, *481 F.2d 1028, 1033 (2d Cir. 1973).* Moreover, objective reasonableness is judged from the perspective of a reasonable officer in the same circumstances and not from the perspective of 20/20 hindsight. Pena-Borrero v. Estremeda, *365 F.3d 7, 12 (1st Cir. 2004).* When judging reasonableness, it must be factored in that "police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." Graham, *490 U.S. at 396*.

In addition, this standard allows for evidence of what is known to the police officer on the scene at the time the force is applied. The knowledge of the police officer forms part of the "facts and circumstances attendant to the decision to use the particular degree of force." See Senra v. Cunningham, *9 F.3d 168 (1st Cir. 1993)*. Of course, "[w]hen police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them." Smith v. Ball State Univ., *295 F.3d 763, 770 (7th Cir. 2002) (finding no constitutional violation where police ordered driver out of car, who refused to do so thus the officers were justified in using force to remove him).*

In the instant case, defendants submit that the amount of force used by Officer Guillette to apprehend plaintiff was reasonable given the circumstances. In addition to her erratic driving and attempt to elude the officer, as proven by her nolo contender plea, plaintiff refused to exit the car when told to do so by Officer Guillette. She then assaulted the officer by kicking him in the groin and ribs. Officer Guillette's measured response through the use of capstun and kneeing plaintiff to gain control of her arms, was more than reasonable.

**B. Count I — Assault and Battery against Officer Guillette**

In Count I, plaintiff seeks to recover on the state law claim for assault and battery for presumptively the same actions that she relies on for her excessive force claim. To render a

defendant liable in an assault action under Rhode Island law, the plaintiff must prove that she was placed in apprehension of imminent harmful or offensive contact. *Restatement (Second) of Torts, § 24*. This is a subjective standard that requires a plaintiff to be aware of the imminent contact and actually suffer apprehension at the possibility of such contact. *Id. at § 27*. Plaintiff need not establish, however, that she was frightened by the defendant's actions only that he suffered apprehension as a result of the actions. The apprehension required for an assault is of imminent or immediate bodily harm. Words alone, therefore, are not sufficient to make a defendant liable for assault. If, however, the words, together with other acts or circumstances, put the plaintiff in apprehension of imminent harmful or offensive contact, then a defendant may be liable for assault. *Id. at § 31*.

In order to prove a cause of action for battery, plaintiff must establish the same intent necessary to prove assault, that is: defendant intended to commit a harmful or offensive touching or to create apprehension of the same. *Id. at § 18(1)(a)*. Unlike a claim for assault, however, in a claim for battery, plaintiff must also show that there has been a harmful or offensive touching on the part of defendant. *Id. at § 18(1)(b)*. Although the plaintiff need not be aware that a touching has occurred in order to recover for battery, the plaintiff must establish that she did not consent to the touching. Hostile intent toward the plaintiff or an intent to cause him injury or embarrassment, however, is not necessary in order to establish a claim for battery. Intent to bring about un-permitted contact is sufficient.

A well-recognized "permitted" contact occurs when a police officer is performing his duties by taking an individual into custody. As noted *infra*, a police officer can use reasonable amount of force to subdue an individual even if the officer is not acting in self-defense. *Sheehan*

*v. West, 27 R.I. 84 (1905).*[2] Such privileged contact relieves the officer from liability for assault and battery.

For all the same reasons that Officer Guillette's actions do not amount to excessive force in violation of plaintiff's Fourth Amendment rights, Officer Guillette is likewise not liable for the state law assault and battery.

**C. Qualified Immunity**

Defendant submits that he is nevertheless entitled to qualified immunity from plaintiff's excessive force and assault and battery claims. It is well-settled that "[q]ualified immunity may exist even though in hindsight a court might determine that the action of the official violated the constitution." *Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) citing Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002) citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999) (applying qualified immunity to state law claims ).*[3] Thus, even if it should ultimately be determined that plaintiff's constitutional right has been violated or that she had been assaulted, the defendant may be relieved from liability by the doctrine of qualified immunity.

The doctrine of qualified immunity emanates from the Supreme Court's pronouncements in *Harlow* where the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[2] The Rhode Island Supreme Court has recognized the interrelationship between § 1983 and the common-law tort for assault and battery. *Dyson v. City of Pawtucket, 670 A.2d 233, 237 (R.I. 1996).*

[3] Defendant submits that this qualified immunity extends to plaintiff's state tort claim for assault and battery. *See Hatch, 311 F.3d at 90 citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999).* Although the Rhode Island Supreme Court has never specifically afforded officials qualified immunity to protect against state law claims, the First Circuit has recognized that Rhode Island has expressed general support for such immunity and thus such immunity should be afforded. *Id.*

known." Harlow, *457 U.S. at 818.* The purpose behind granting officials such immunity is to allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence and without fear of consequence." Id. *at 819.* Officials, therefore, enjoy "an immunity from suit rather than a mere defense to liability [which] . . . is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).* "In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken. " *Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).*

The First Circuit has prescribed the following "three-step algorithm" for determining if a party is entitled to qualified immunity:

> [C]onsider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right. *Id.*

As more fully outlined above, plaintiff does not move beyond the first step of the algorithm because, even accepting the allegations as true, the defendants' actions do not amount to a violation of plaintiff's constitutional rights. Defendants submit that even if defendant's actions, if proven true, could be found to give rise to a constitutional deprivation, he is nevertheless entitled to qualified immunity because a reasonable officer in his shoes would not believe that his actions violated plaintiff's clearly established right. This third step involves applying a good faith test that allows questions of qualified immunity to be decided as a matter of law in appropriate cases. *Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir. 1986).* This test requires viewing the official's actions from an objectively reasonable standpoint. The decisive question becomes whether another police officer, standing in the shoes of this

defendant, would have concluded that their actions violated a clearly established statutory or constitutional right. *See Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)*. A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991)*. The First Circuit has observed that the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting' all but the plainly incompetent or those who knowingly violate the law.'" *Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)*. In the instant case, defendants submit that it can hardly be said that a reasonable officer standing in these officers' shoes would believe that their actions violated decedent's clearly established constitutional rights.

**D. Counts II & IV — Equal Protection and Eleventh Amendment Claims**

As noted, in Count II and IV[4] plaintiff also make the general allegation that the actions of Officer Guillette amount to a violation of her right to "equal protection and civil rights" as "afforded the plaintiff by virtue of the Fourth, Eleventh and Fourteenth amendments to the U.S. Constitution." *Plaintiffs' Complaint, ¶ 9*. As an initial matter, it would appear that plaintiff's reference to an Eleventh Amendment violation is in error. The Eleventh Amendment guarantees that nonconsenting states may not be sued by private individuals in federal court. *U.S. Const. Amend. XI.*[5] *Bd. of Trustees v. Garrett, 531 U.S. 356 (2001)*. The Eleventh Amendment does not grant individuals any particular rights or guarantees but rather protects the State from federal suit. Because the instant case does not involve a suit against the state, there is no basis for an Eleventh Amendment claim.

---

[4] See Note 1.

[5] The Eleventh Amendment specifically states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Plaintiff, however, also generally references her equal protection guarantees in Count II. The Equal Protection Clause of the Fourteenth Amendment provides, in part, that "no State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. Amend. XIV.* In the instant case, despite the claim that defendant's actions violated plaintiff's right to equal protection, plaintiff's Complaint offers factual allegations to support for her equal protection claim. Presumptively, plaintiff's equal protection claim is premised on her status as a woman. However, in order to succeed on an equal protection claim, plaintiff "must present evidence that [s]he was treated differently from similarly situated . . . . motorists and the action taken against [her] was motivated, at least in part, by [her gender]." *Flowers v. Fiore, 239 F.Supp.2d 173, 178 (D.R.I. 2003).* This has been

broken down into two inquiries: (1) whether the appellant was treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration, such as race. *Macone v. Town of Wakefield, 277 F.3d 1, 10 (1st Cir. 2002)(citations omitted). Cf. Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000)(in order to succeed on claim, litigant must prove that the police acted in a discriminatory manner and that the discrimination was intentional).*

In the instant case, plaintiff fails to satisfy either element. In the first instance, plaintiff does not even allege that she was treated differently than similarly situated individuals because of her gender. There are likewise no facts in the instant case to support the second prong of an equal protection analysis by proving that the action taken against plaintiff was motivated at least in part by her gender. *Macone, 277 F.3d at 10 (1st Cir. 2002*). "A long line of Supreme Court cases makes clear that the Equal Protection Clause requires proof of discriminatory intent or motive." *Navarro v. Block, 72 F.3d 712, 716 (9th Cir. 1995); Correa-Martinez v. Arrillaga-*

Belendez, *903 F.2d 49, 53 (1st Cir.1990)(plaintiff "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by discriminatory animus").* In support of the same, "the facts alleged must 'specifically identify the particular instance(s) of discriminatory treatment and, as a logical exercise, adequately support the thesis that the discrimination was unlawful.'" Judge v. City of Lowell, *160 F.3d 67, 77 (1st Cir. 1998).* Intentional or purposeful discrimination, "'implies more than intent as volition or intent as awareness of consequences.' It implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adversive effects on the identifiable group." Muckway v. Craft, *789 F.2d 517, 520 ( 7th Cir. 1986) quoting* Shango v. Jurich, *681 F.2d 1091, 1104 (7th Cir. 1982).* A "discriminatory purpose" is not presumed, there must be a showing of 'clear and intentional discrimination.'" Snowden V. Hughes, *321 U.S. 1, 8 (1944).*

Thus, the mere fact that plaintiff is a woman and Officer Guillette a man is not sufficient to create the inference of discriminatory intent or motive. Id.; Flowers, *239 F.Supp.2d at 178*. In Judge, for example, the plaintiff brought a §1983 equal protection claim against city police officers and medical examiner alleging that they failed to properly investigate the circumstances of her brother's death. The basis for the plaintiff's claim in that case was that the defendants failed to take certain actions such as notifying her of her brother's death solely because she was black. Id. *at 77*. The plaintiff, however, offered no other evidence to support these allegations. The First Circuit concluded that such " mere conclusory assertion[s]" that the defendant's actions were racially motivated is not sufficient to maintain an equal protection claim. Id. This District Court, Judge Torres, likewise dismissed an equal protection claim where the only evidence of discriminatory motive was the fact that the plaintiff was black and the officers were white. See

Flowers, *239 F.Supp.2d at 177 (no evidence to support conclusion that the officers detained plaintiff because of his race).*

Likewise, in the instant case, there are no facts or even allegations to support a claim that plaintiff's right to equal protection have been violated.

**E. Counts III & IV — Negligent Training/Supervision in Violation of Civil Rights against Town**

In Counts III & IV[6] plaintiffs allege that the Town violated plaintiff's "Due Process, Equal Protection and Civil Rights" in failing to supervise and train its officers. In order to maintain a claim against a municipality under *§ 1983,* the plaintiff must demonstrate in the first instance that it was an unlawful, unconstitutional policy, practice or custom that lead to the constitutional deprivation. *Monell v. City of New York Dept. of Soc. Services, 436 U.S. 658 (1978)*. In *City of Canton v. Harris, 489 U.S. 378, 387 (1989),* the Supreme Court clarified the standard and held that the "policy" requirement limiting municipal liability in *§ 1983* cases under *Monell* can be satisfied in municipal "failure to train" cases only (1) where employees of a local government commit a constitutional violation (2) due to a lack of training by municipal policy makers (3) who are "deliberately indifferent" to the need for the training and 4) it was this lack of training that caused the constitutional violation.

To the extent plaintiff is seeking to maintain a claim under *§ 1983* against the Town of Coventry for failure to properly train, the burden on plaintiff is high. In fact, in City of Canton, the United States Supreme Court held that there are only "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." City of Canton, *489 U.S. at 387.* This standard thus first requires a constitutional event, *i.e.*, an underlying constitutional violation that the failure to train causes. Bad facts or a single outrageous event is

[6] See Note 1.

insufficient. Some kind of wrong of constitutional dimension must be present. *Monell, 436 U.S. at 690-91.* In the instant case, as more fully outlined above, plaintiff has failed in the first instance to demonstrate a violation of decedent's constitutional rights. Thus, plaintiff's § 1983 claim against the municipality will likewise fail. *City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996)(where individual officers did violate plaintiff's constitutional rights in the course of a high speed pursuit, the City likewise could not be held liable for the alleged failure to monitor police pursuits and through its failure to supervise police officers involved in such pursuits).*

Even if plaintiff is successful in establishing a constitutional deprivation, plaintiff must demonstrate that the defendants were deliberately indifferent in the failure to train. In City of Canton, the plaintiff had alleged that due to the inadequacy of police training, the City of Canton and its officials violated plaintiff's constitutional right to receive medical attention while in police custody. *City of Canton, 489 U.S. at 382*. After the jury ruled in the plaintiff's favor, the city made a motion for judgment notwithstanding the verdict, claiming that a municipality can only be found liable under § 1983 where the policy in place is itself unconstitutional. In rejecting the city's narrow interpretation of § 1983, the *Canton* Court established the following standard for evaluating valid policies alleged to have been unconstitutionally applied:

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to **deliberate indifference** to the rights of persons with whom the police came into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 . . . . Only where a failure to train reflects a 'deliberate' or

> 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983. *Id. at 388-89 (emphasis added).*

Thus, for liability to stem from failure to train, the Plaintiff must show an actual policy of inadequate training, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id. at 390*. Plaintiff must also demonstrate that a municipality *deliberately* chose an inadequate training program. *Id. at 389*.

The "deliberate indifference" standard has been broken down into three elements:

> (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation;
>
> (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and
>
> (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

*Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005) citing Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (citations omitted).*

"Absent any showing of previous harm arising from this training policy, or any evidence of deliberation on the [defendants'] part there is no basis to support the conclusion that a municipality actually chose a policy with deliberate indifference toward the constitutional rights of individuals." *K v. City of S. Portland, 407 F. Supp. 2d 290, 297 (D. Me. 2006).* The Supreme Court has also noted that:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. *See Springfield v. Kibbe, 480 U.S., at 268 (O'Connor, J., dissenting); Oklahoma*

> City v. Tuttle, *supra, at 821 (opinion of Rehnquist, J.)*. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable. City of Canton, *489 U.S. at 390-91.*

Finally, as with all constitutional claims, plaintiff can only succeed on its failure to train claim under *§ 1983* if that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See* City of Canton, *489 U.S. at 388*. A governmental entity "'is only liable when it can be fairly said that the city itself is the wrongdoer." Collins v. City of Harker Heights, *503 U.S. 115, 122 (U.S. 1992)*. The Supreme Court has employed an "actual causation" standard in claims against a municipality for the negligent training and supervision of government officials under *42 U.S.C. § 1983*. City of Canton, *489 U.S. at 390*. That is, in order to maintain a *§ 1983* claim against a municipality, plaintiff must demonstrate that the claimed deficiency "actually causes injury." *Id.* The Supreme Court has described this burden as requiring a showing that "the identified deficiency in a city's training program . . . [is] closely related to the ultimate injury. . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id. at 391.*

The determination of whether there is a causal link has been characterized as a legal conclusion rather than a function of objective fact. Britton, *901 F.Supp. at 444 (D. Mass 1995).* The Supreme Court has further tutored that in order to determine if a plaintiff has met this "rigorous standard" of causation, the Court should refer to state tort principles. Rodriguez-Cirilo v. Garcia, *C.A. No. 96-1306 (1st Cir., June 2, 1997);* Soto v. Carrasquillo, *878 F.Supp. 324, 331 (D. Puerto Rico 1995).*

Defendants submit that in the instant case, plaintiff will not be able to establish that the Town had a policy of inadequate training of its officers or that they were deliberately indifferent to the need of a training program. In the final analysis, defendants submit that plaintiff will fail to demonstrate that a failure to train caused plaintiff to suffer a constitutional deprivation.

**F. Count V — Loss of Consortium R.I. GEN. LAWS § 9-1-41 (Town of Coventry and Guillette)**

In Count V, a claim for loss of consortium has been brought on behalf of James Whittle, plaintiff's husband.[7] Section 9-1-41 of R.I. General Laws had codified the right of both married persons and unemancipated minors to recover damages for loss of consortium and for loss of parental society and companionship, respectively, caused by tortious injury to an impaired spouse or parent. *R.I. GEN. LAWS § 9-1-41*. This codification maintained the common law nature of a loss of consortium claim as being derivative of the underlying claim of the injured spouse. *Sama v. Cardi Corp., 569 A.2d 432 (R.I. 1990),* Thus, under *§ 9-1-41,* as at common law, "a loss of consortium claim 'depends on the success of the underlying tort claim.'" *Olshansky v. Rehrig*

---

[7] Defendants note that Mr. Whittle passed away on October 13, 2006, from end stage liver disease due to ETOCH abuse. *Plaintiff's Deposition, (January 24, 2007) at 6.* Although not overly clear, it is possible that the loss of consortium claim may not survive the death of Mr. Whittle. More precisely, under Rhode Island's survival statute, R.I.G.L. § 9-1-6, only claims of waste, replevin and conversion, and claims for damage to the person or to real and personal estate survive the death of a party. *R.I.G.L. § 9-1-6*. In the instant case, it is clear that Mr. Whittle's loss of consortium claim does not involve a claim for waste, replevin or conversion. The question thus becomes whether a cause of action for loss of consortium amounts to "damage to the person." The words "damages to the person" has been interpreted under Rhode Island law to mean bodily or physical injury and do not include feeling and reputation. *Young v. Aylesworth, 35 R.I. 259, 86 A. 555 (1913)*. Other jurisdictions that have addressed this question, including the U.S. Supreme Court, have concluded loss of consortium damages are not compensation for physical damage to the person or for bodily injury. *Stewart v. State Farm Mut. Auto. Ins. Co., 341 S.C. 143, 152, 533 S.E.2d 597 (S.C. Ct. App. 2000); Owen v. Vieira, 2002 U.S. Dist. LEXIS 5910 (D. Ill. 2002) (loss of consortium award were not compensation for physical damage to the person and therefore bankruptee was not entitled to exempt those proceeds); In re McWhorter, 2006 Bankr. LEXIS 722, 5-6 (Bankr. D.S.C. 2006) ("Consequential damages, such as loss of consortium, medical and hospital expenses, etc., are generally held not to constitute 'bodily injuries' ....").* However, it is noteworthy that in the Superior Court rescript, when addressing a challenge to the General Assembly's application of a three (3) year statute of limitations to a loss of society claim, a Superior Court judge noted that "the statute is obviously classifying loss of consortium as personal injury." *Ferns v. Merrell Dow Pharm. Inc., 1991 R.I. Super. Lexis 69 (1991)(Gibney, J.)*

*Int'l, 872 A.2d 282, 291 (R.I. 2005) quoting Soares v. Ann & Hope of Rhode Island, Inc., 637 A.2d 339, 353 (R.I. 1994).*

Reversing prior Rhode Island common law that only allowed spouses to recover for loss of services, § 9-1-41 allows recovery for loss of affection, society, and companionship as well as services. *Amaral v. Cabral, 494 A.2d 94, 96 (R.I. 1985).* Thus, "[u]nder R.I.G.L. § 9-1-41 loss of consortium and loss of society claims arise because an injured spouse, parent or child, due to a tortious injury, can no longer supply the affection, companionship and society natural to such a relationship." *Fritz v. May Dep't Stores Co., 866 F. Supp. 66, 70 (D.R.I. 1994).* That having been said, simply because a party has been tortiously injured does not automatically mean that a spouse is entitled to loss of consortium damages. Rather, the spouse "necessarily first must prove that he or she actually did suffer a loss of consortium," *Conant v. Zerva, 793 A.2d 1042, 1044 (R.I. 2002) citing Jameson v. Hawthorne, 635 A.2d 1167, 1172-73 (R.I. 1994).*
by demonstrating a change in "the affection, companionship and society *natural* to" the party's relationship, *Fritz, 866 F. Supp. at 70 (emphasis added).* Defendants submit that even if the jury were to reach the issue of loss of consortium by first finding a tortious injury to plaintiff, the evidence will not support a finding that the claimed injury interfered with the party's natural relationship.

## III. WITNESSES

In accordance with the ECF Filing requirements, defendants' witness list will be filed under separate cover and filed conventionally with the District Court's Clerk's Office.

## IV. EXHIBITS

In accordance with the ECF Filing requirements, defendants' exhibit list will be filed under separate cover and filed conventionally with the District Court's Clerk's Office.

## V. ANTICIPATED MOTIONS IN LIMINE

None at this time.

## VI. JURY INSTRUCTIONS

Proposed jury instructions will be filed under separate cover. Defendants' proposed jury verdict form is attached hereto as *Exhibit A*.

## VII. PROBABLE LENGTH OF TRIAL

Defendants estimate that trial in the instant matter will take approximate five (5) to six (6) trial days.

## VIII. ADDITIONAL MATTERS

### A. ***Heck v. Humphrey***

Defendants submit that an additional matter that may need to be considered by the Court during trial is the implication under *Heck v. Humphrey, 512 U.S. 477, 486-87 (1994)* and *Thore v. Howe, 466 F.3d 173, 181 (1st Cir. 2006)* on the factual support for plaintiff's assault conviction compared to the excessive force/assault claims against Officer Guillette. More specifically, in *Heck v. Humphrey* the U.S. Supreme Court held that where a § 1983 suit for damages would "necessarily imply" the invalidity of a party's conviction such a claim is not cognizable under § 1983 unless and until the party obtains favorable resolution of a challenge to the conviction. *Heck, 512 U.S. at 487.*

The First Circuit very recently addressed the implications of the *Heck* rule on a *§ 1983* claim for excessive force when the underlying criminal conviction was for assault on the police officer. In *Thore,* the plaintiff had been convicted of assault on a police officer for driving his car at several officers and hitting their cruisers with his car. *466 F.3d at 175*. The officers subsequently shot plaintiff. After his conviction, plaintiff initiated a *§ 1983* action against the

police officers for excessive force during his arrest. The First Circuit explained that plaintiff's first argument - - namely, that he was not guilty of assault at all - - was a non-starter and was "barred by *Heck*." *Thore, at 179*. The Court noted however, that plaintiff's second theory, that his proof that the officer used excessive force claim need not necessarily impugn his conviction for assault and battery with a dangerous weapon, required further factual analysis. *Id. at 180.* The Court specifically held that:

> Just as it is true that a § 1983 excessive force claim after an assault conviction is not necessarily barred by Heck, it is also true that it is not necessarily free from Heck. The excessive force claim and the conviction may be so interrelated factually as to bar the § 1983 claim. *Id. citing Cunningham v. Gates, 312 F.3d 1148, 1154-55 (9th Cir. 2002).*

Thus, the First Circuit, relying on *Heck* concluded that "the district court must consider the relationship between the § 1983 claim and the conviction, including asking whether the plaintiff could prevail only by 'negat[ing] an element of the offense of which he [was] convicted.'" *Id. at 179.* This will involve examining the interrelatedness of the factual support for both the criminal conviction and the excessive force claim. *Id.* If the excessive force claim and the conviction is so interrelated factually than the § 1983 claim may be barred. *Id. at 180.* "In evaluating whether claims are barred by *Heck*, an important touchstone is whether a *§ 1983* plaintiff could prevail only by negating "an element of the offense of which he has been convicted." *Cunningham, 312 F.3d at 1153-1154 citing Heck, 512 U.S. at 487 n.6.*

In the instant case, defendants submit that the factual basis as developed at trial to support her excessive force claim may turn out to be so interrelated to her assault conviction such to undermine that conviction and thus bar the *§ 1983* claim against defendant. Should that be the case, defendants would move for the entry of judgment based on *Heck* and *Thore*.

**B. Judicial Estoppel**

Defendants submit that yet another issue that may be raised during trial is the doctrine of judicial estoppel. More precisely, in Thore, the First Circuit rejected any per se rule that judicial estoppel always applies or never applies to facts admitted during a guilty plea. Rather, the Court recognized that there are standards that govern whether the doctrine applied to a particular case as well as exceptions to the equitable doctrine. Generally in order for judicial estoppel to attach in the first place, the party's later position must be clearly inconsistent with its earlier position; the party must have succeeded in persuading a court to accept the party's earlier position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception of inconsistent court determinations; and an unfair advantage or detriment must be created. *Thore, 466 F.3d at 181.* Recognized exceptions include inadvertence and mistake. *Id.*

Defendants raise this matter with the Court as a potential additional issue that might need to be addressed during trial depending on plaintiff's testimony. In particular, in addition to pleading nolo contendere to the charge of assault, plaintiff likewise pled nolo to the charge of reckless driving and eluding the police officer. During her deposition plaintiff testified that she thought the officer was "escorting her home" when he appeared behind her with his lights and siren activated and thus she continued on her way driving off the road to avoid the mud. To the extent such testimony is inconsistent with plaintiff's prior plea of eluding a police officer and reckless driving, defendants will be relying on judicial estoppel.

**C. Rape Allegations**

Another matter that the Court should be aware of is defendants' intent to question plaintiff about her false rape allegations against Officer Guillette. Although plaintiff has chosen

not to pursue civil damages stemming from this rape allegation, defendants will seek to challenge plaintiff's credibility by questioning her about these false allegations.

Defendants,
Town of Coventry, Coventry Police
Department, and Gregory Guillette,
By their attorney,

*/s/ Marc DeSisto*

Marc DeSisto, Esq. (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
(401) 272-4442
(401) 272-9937 fax
marc@desistolaw.com

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court on 1st day of May, 2007, and is available for viewing and downloading from the ECF system and that the counsel of record listed below will receive notice via the ECF system:

James P. Howe, Esq.
jph@jamesphowe.com

*/s/ Marc DeSisto*

Marc DeSisto, Esq. (#2757)